1  Jason S. Hartley (CA Bar. No. 192514)
2  STUEVE SIEGEL HANSON LLP
   550 West C Street, Suite 1750
3  San Diego, CA 92101
   Phone:   (619) 400-5822
4  Fax:  (619) 400-5832
   hartley@stuevesiegel.com
5
6  Steve Six
   (admitted *pro hac vice*)
7  STUEVE SIEGEL HANSON LLP
   460 Nichols Road, Suite 200
8  Kansas City, Missouri 64112
   Phone:   (816) 714-7100
9  Fax:  (816) 714-7101
   siegel@stuevesiegel.com
10
11 *Attorneys for Plaintiffs*

12              **IN THE UNITED STATES DISTRICT COURT**

13          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

14                      **EASTERN DIVISION**

15

16  CHRISTINA and JOHN LABAJO,            CASE NO. EDCV 14-00627-VAP
17  on Behalf of Themselves and All Others  (DTB)
    Similarly Situated,
18
19              Plaintiffs,                **PLAINTIFFS' RESPONSE IN
                                           OPPOSITION TO DEFENDANT
20        vs.                              FIRST INTERNATIONAL BANK
                                           & TRUST'S MOTION TO
21                                         COMPEL ARBITRATION**
22  FIRST INTERNATIONAL BANK &
    TRUST, and MUTUAL OF OMAHA
23  BANK                                   Date:       July 14, 2014
                                           Time:       2:00 p.m.
24              Defendants.                Courtroom:  2
                                           Hon. Virginia A. Phillips
25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................1

BACKGROUND .................................................................................................3

ARGUMENT .......................................................................................................5

    I.     Plaintiffs Did Not Agree to Arbitrate Against First Int'l.......................5

    II.    The Issue of Arbitrability is for this Court to Decide. ...........................6

    III.   First Int'l Is Not a Third-Party Beneficiary of the Agreements.............8

    IV.   First Int'l Is Not An Agent of SFS or MNE.........................................12

    V.    First Int'l Cannot Invoke Equitable Estoppel. ....................................16

         A.   First Int'l Cannot Satisfy the Substantially Interdependent and Concerted-Misconduct Test for Invoking Equitable Estoppel. ..22

         B.   First Int'l's Unclean Hands Bars it from Utilizing Equitable Doctrines to Enforce Clauses Contained in the Loan Agreements. .................................................................................25

i

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT FIRST INTERNATIONAL'S MOTION TO COMPEL ARBITRATION
CASE NO. EDCV 13-01861-VAP (DTB)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### **TABLE OF AUTHORITIES**

### **Cases**

*Am. Bankers Ins. Grp., Inc. v. Long*,
  453 F.3d 623 (4th Cir. 2006)................................................................17

*Amisil Holdings Ltd. v. Clarium Capital Mgmt.*,
  622 F. Supp. 2d 825................................................................15, 19

*Apple & AT&T Mobility Antitrust Litig.*,
  826 F. Supp. 2d 1168 (N.D. Cal. 2011) ...............................................24

*Arthur Andersen LLP v. Carlisle*,
  556 U.S. 624 (2009) ................................................................16

*BG Group, PLC v. Rep. of Argentina*,
  134 S.Ct. 1198 (2014) ................................................................8

*BMO Harris Bank, N.A.*,
  No. 1:13-CV-897, 2014 WL 911950  (M.D.N.C. Mar. 10, 2014)........................2

*Boston Telecomm. Group, Inc., v. Deliotte Touche Tohmatsu*,
  278 F. Supp. 2d 1041 (N.D. Cal. 2003) ...............................................24

*Brantley v. Republic Mortg. Ins. Co.*,
  424 F.3d 392 (4th Cir. 2005)................................................................21

*Cardenas v. AmeriCredit Fin. Servs. Inc.*,
  C 09-04978 SBA, 2011 WL 2884980 (N.D. Cal. July 19, 2011)........................21

*Chastain v. Union Sec. Life Ins. Co.*,
  502 F. Supp. 2d 1072 (C.D. Cal. 2007)................................................................10

*Cook v. La Vina Land Co.*,
  39 P.2d 458 (Cal. App. 3d Dist. 1934)................................................................12

*Denney v. Jenkens & Gilchrist*,
  412 F. Supp. 2d 293 (S.D.N.Y. 2005)................................................................21

*Dillon v. BMO Harris Bank, N.A.*,
  No. 1:13-CV-897, 2014 WL 1671591 (M.D.N.C. Apr. 23, 2014) ........................2

*Elder v. BMO Harris Bank*,
  CIV. JFM-13-3043, 2014 WL 1429334 (D. Md. Apr. 11, 2014) ...................14, 19

*First Options of Chi., Inc. v. Kaplan*,
  514 U.S. 938 (1995) ................................................................7, 8

*Garcia v. Stonehenge, Ltd.*,
  C-97-4368-VRW, 1998 WL 118177 (N.D. Cal. Mar. 2, 1998)..............................9

ii

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT FIRST INTERNATIONAL'S MOTION TO COMPEL ARBITRATION
CASE NO. EDCV 13-01861-VAP (DTB)

*Goldman v. KPMG LLP*,
   173 Cal.App.4th 209, 92 Cal.Rptr.3d 534 (2009) ....................................20, 22, 23

*Hansen v. KPMG, LLP*,
   No. CV 04-10525, 2005 WL 6051705 (C.D. Cal. Mar. 29, 2005) .......................24

*Hawkins v. KPMG LLP*,
   423 F. Supp. 2d 1038 (N.D. Cal. 2006) ...............................................................25

*Howsam v. Dean Witter Reynolds, Inc.*,
   537 U.S. 79 (2002) ......................................................................................7, 8

*In re Apple iPhone 3G Prods. Liab. Litig.*,
   859 F. Supp. 2d 1084 (N.D. Cal. 2012) ...............................................................20

*In re Carrier IQ, Inc. Consum. Priv. Litig.*,
   C-12-MD-2330 EMC, 2014 WL 1338474 (N.D. Cal. Mar. 28, 2014) .................19

*In re Humana Inc. Managed Care Litig.*,
   285 F.3d 971 (11th Cir. 2000) ..............................................................................24

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   MDL No. 1827, 2014 WL 1395733 (N.D. Cal. April 10, 2014) ...........................7

*In re Wholesale Grocery Prods. Antitrust Litig.*,
   707 F.3d 917 (8th Cir. 2013) ................................................................................24

*Intamin, Ltd. v. Magnetar Tech. Corp.*,
   623 F. Supp. 2d 1055 (C.D. Cal. 2009) ................................................................25

*Jajco, Inc. v. Leader Drug Stores, Inc.*,
   C 12-05703 PJH, 2013 WL 2403593 (N.D. Cal. May 31, 2013) ...........................9

*Joe A. Freitas & Sons v. Food Packers, Processors & Warehousemen Local 865*,
   211 Cal. Rptr. 157 (Cal. Ct. App. 1985) ...............................................................25

*Kaiser Steel Corp. v. Mullins*,
   455 U.S. 72 (1982) ................................................................................................25

*Karo v. San Diego Symphony Orchestra Ass'n*,
   762 F.2d 819 ...........................................................................................................9

*Keystone Driller Co. v. General Excavator Co.*,
   290 U.S. 240 (1933) ..............................................................................................25

*Kramer v. Toyota Motor Corp.*,
   705 F.3d 1122 (9th Cir. 2013) ......................................................................passim

*Laguna v. Coverall N. Am., Inc.*, No.,
   09cv2131, 2011 WL 3176469, (S.D. Cal. July 26, 2011) ....................................21

*Laster v. T-Mobile USA, Inc.*,

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT FIRST INTERNATIONAL'S MOTION TO COMPEL ARBITRATION
CASE NO. EDCV 13-01861-VAP (DTB)

05CV1167 DMS WVG, 2013 WL 4082682 (S.D. Cal. July 19, 2013)................15

*Laumann v. Nat'l Hockey League*,
  No. 12 Civ. 1817(SAS), 2013 WL 6171671 (S.D.N.Y. Nov. 25, 2013) ................8

*Letizia v. Prudential Bache Sec., Inc.*,
  802 F.2d 1185 (9th Cir. 1986)................15

*Mendoza v. Ad Astra Recovery Servs. Inc.*,
  2:13-CV-06922-CAS, 2014 WL 47777 (C.D. Cal. Jan. 6, 2014)........15

*Murphy v. DirecTV, Inc.*,
  724 F.3d 1218 (9th Cir. 2013)................passim

*Nichols v. Arthur Murray, Inc.*,
  248 Cal. App. 2d 610 (Cal. App. 4th Dist.1967) ................12

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
  324 U.S. 806 (1945) ................25

*Rajagopalan v. NoteWorld, LLC*,
  718 F.3d 844 (9th Cir. 2013)................21

*Rankin v. Global Tel\*Link Corp.*,
  13-CV-01117-JCS, 2013 WL 3456949 (N.D. Cal. July 9, 2013)................9

*Reddam v. KPMG LLP*,
  SACV04-1227GLT(MANX), 2004 WL 3761875 (C.D. Cal. Dec. 14, 2004) ......15

*State Nat'l Ins. Co. v. Khatri*,
  C 13-00433 LB, 2013 WL 5183193 (N.D. Cal. Sept. 13, 2013) ................9

*United Steelworkers v. Warrior & Gulf Navigation Co.*,
  363 U.S. 574 (1960) ................6

*Vallely Inv., L.P. v. Bancamerica Commercial Corp.*,
  106 Cal. Rptr. 2d 689 (Cal. App. 4 Dist. 2001) ................12

*Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*,
  489 U.S. 468 (1989) ................6

## **Statutes**

18 U.S.C. § 1961(6) ................21

## **Rules**

Fed. R. Civ. P. 14 ................10

Fed. R. Civ. P. 41(a) ................1

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT FIRST INTERNATIONAL'S MOTION TO COMPEL ARBITRATION
CASE NO. EDCV 13-01861-VAP (DTB)

# **INTRODUCTION**

On March 11, 2014, Plaintiffs in this action voluntarily dismissed an earlier lawsuit against Defendants Mutual of Omaha Bank and First International Bank & Trust ("First Int'l") after this Court heard oral argument on Defendants' motion to compel arbitration and issued a tentative ruling granting the motion. Although the arbitration clauses at issue were contained in payday loan agreements to which Defendants were not parties, the tentative ruling opined that Defendants may fall within the scope of the agreements as "servicers" or "agents" of the payday lenders. Because the Federal Rules of Civil Procedure do not provide a mechanism to amend a Complaint as of right after the filing of a motion to compel arbitration, Plaintiffs opted to dismiss the action voluntarily pursuant to Fed. R. Civ. P. 41(a) and file a new Complaint—marked as related to the earlier case—with substantially more allegations detailing the relationship between Defendants and the payday lenders.

As set forth in the Complaint, there are a host of reasons why Originating Depository Financial Institutions ("ODFI") banks such as First Int'l cannot be considered "agents" or "servicers" of payday lenders in the ACH Network. (Doc. 1, ¶¶ 77-88). Perhaps most persuasive is the fact that First Int'l has its own contractual agreements with the payday lenders (known as "Origination Agreements") that "either expressly disclaim an agency relationship or make clear by their terms that the nature and scope of the parties' relationship is not that of principal-agent." (*Id.*, ¶ 81). Indeed, Exhibit B to the new Complaint is a sample Origination Agreement between a bank and an originator on the ACH Network which expressly disclaims an agency relationship and sets forth no obligations that could possibly be construed as those of a loan "servicer." (*See* Doc. 1, p. 76, ¶ 24). Remarkably, First Int'l has steadfastly refused Plaintiffs' written requests to provide its Origination Agreements with payday lenders, despite their obvious relevance to issues before the Court.[1]

---

[1] *See* Declaration of Jason Hartley ("Hartley Dec.") ¶¶ 3-4.

Furthermore, First Int'l repeatedly cites to hearing transcripts and cases filed outside California to which Defendants are not parties. (*See* Doc. 26-1, pp. 13, 14). While the cases may be similar factually, they have little significance here as those courts are interpreting different agreements and different states' laws.[2]

First Int'l also contends that "nothing has changed regarding the merits of First Int'l's original motion to compel arbitration." (Doc. 26-1, p. 8). In fact, the new Complaint alleges much greater detail regarding the operation of the ACH Network and effect of the NACHA Operating Rules and Operating Guidelines (collectively "NACHA Rules") on ODFI banks like First Int'l (*see* Doc. 1, ¶¶ 35-61); First Int'l's direct knowledge of the illegal loans it was originating (*see* Doc. 1, ¶¶ 89-107; 113-117); what is required to be included in an Origination Agreement between ODFI banks and Originators like online payday lenders and why those agreements routinely *disclaim* an agency relationship (*see* Doc. 1, pp. 63,64  ¶¶ 77, 78; Ex. A); and the obligations of a loan "servicer" as that term is understood in the lending industry and why ODFI banks cannot meet that definition (*see* Doc. 1, ¶¶ 82-88). Because First Int'l relies on the Complaint to argue it is an "agent" or "servicer" of the payday lenders, rather than provide extrinsic evidence to that effect, Plaintiffs' new allegations, taken as true, are determinative as to the issues before the Court. First Int'l is not contemplated as a "related party" under the payday loan agreements and cannot enforce the arbitration provisions as a non-party under established law.

---

[2] To the extent these outside cases are persuasive, First Int'l fails to alert the Court to the Middle District of North Carolina's decision in *Dillon. v. BMO Harris Bank, N.A.*, No. 1:13-CV-897, 2014 WL 911950  (M.D.N.C. Mar. 10, 2014), in which the Court denied the motions to compel arbitration where defendants failed to show the existence of authentic agreements to arbitrate. Subsequently, the *Dillon* court rejected all defendants' motions to dismiss plaintiff's claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), North Carolina Unfair and Deceptive Trade Practices Act, and for unjust enrichment. *Dillon v. BMO Harris Bank, N.A.*, No. 1:13-CV-897, 2014 WL 1671591 (M.D.N.C. Apr. 23, 2014).

2

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT FIRST INTERNATIONAL'S MOTION TO COMPEL ARBITRATION
CASE NO. EDCV 13-01861-VAP (DTB)

## BACKGROUND

First Int'l seeks to enforce an arbitration provision—to which it is not a party—between Plaintiffs Christina and John Labajo ("Plaintiffs") and the notorious illicit online payday lenders MNE Services, Inc. ("MNE") and SFS, Inc. ("SFS").[3] Unlicensed payday lenders like MNE and SFS (the "Illegal Payday Lenders") operate over the Internet to circumvent the laws of certain states, including California, which severely restrict or outlaw payday loans.[4]

The ACH Network is a processing system in which financial institutions accumulate ACH transactions throughout the day for later batch processing. (Doc. 1, ¶ 35). The extensive NACHA Rules govern the ACH Network and provide the legal framework for operating in the network. (Doc. 1, ¶ 37). In an ACH transaction, a merchant, the "Originator" (in this case the Illegal Payday Lenders), receives authorization from a party (in this case the borrower) to initiate credits or debits on the ACH Network. (*Id.*, ¶ 38). The Originator (or a "Third-Party Sender" working on the Originator's behalf) then must find an ODFI bank in the ACH Network that is willing to enter into a separate written contract with the Originator to "originate" credit or debit entries into the network on the Originator's behalf—known as an "Origination Agreement." (*Id.*, ¶¶ 38, 45). The NACHA Rules require, among other things, that the Origination Agreement give the ODFI complete control to terminate or suspend the agreement for the Originator's breach of the NACHA Rules or other

---

[3] USFastCash and OneClickCash are the d/b/a names of MNE and SFS, respectively. Both are identical companies operating under the "rent-a-tribe" strategy to avoid liability for their unlawful activity, and both have been pursued for such activity by the Federal Trade Commission and a host of state attorneys general. *See, e.g., FTC v. AMG Servs., Inc.*, No. 2:12-cv-536 (D. Nev. Apr. 2, 2012).

[4] In California, only lenders who receive a license from the Department of Corporations are authorized to make payday loans. The maximum loan amount is capped, as are the payday lender fees. Loans made by unlicensed lenders must comply with California's constitutional usury restrictions. (Doc. 1, ¶ 4).

3

1    unlawful behavior. (*Id.*, ¶ 77).

2        Both before and after entering into an Origination Agreement, ODFIs are

3    required to (i) exercise appropriate risk-based diligence when bringing on new

4    Originators and Third Party Senders and (ii) perform appropriate monitoring to

5    determine whether excessive returns or other suspicious patterns of activity warrant

6    further review or more aggressive action. (*Id.*, ¶ 54). These requirements are meant

7    to keep illicit and unlawful transactions, like those alleged here, out of the ACH

8    Network. (*Id.*, ¶¶ 45-61). The Office of the Comptroller of the Currency and the

9    Federal Deposit Insurance Corporation have also offered substantial guidance to

10   ODFIs regarding the "significant risks" involved for banks in originating

11   transactions for high-risk merchants like online payday lenders. (*Id.*, ¶¶ 62-76).

12       ODFIs are referred to by NACHA as the "gatekeepers" of the ACH Network

13   and are obligated to exercise control over the Originators they grant Network access.

14   (*Id.*, ¶¶ 45, 77). This is why the overwhelming majority of ODFIs have never

15   originated entries on the ACH Network for Illegal Payday Lenders. (*Id.*, ¶ 91). First

16   Int'l is one of a handful of ODFIs to do so. Unsurprisingly, ACH debits originated

17   on behalf of the Illegal Payday Lenders far exceed the average return rate for all

18   electronic payments. (Doc. 1, ¶ 99). In exchange for its additional risk, First Int'l

19   charges payday lenders higher fees to originate high-risk payday loans entries than

20   are customarily paid by legitimate originators. (*Id.*, ¶ 92).

21       While First Int'l attempts to characterize "transmitting the payments Plaintiffs

22   made on their loans" for the Illegal Payday Lenders as "routine banking services"

23   (Doc. 26-1, p. 15), entering into Origination Agreements with companies that

24   brazenly violate California law are not "routine."  In fact, California has taken

25   action against Illegal Payday Lenders, including a 2006 "Desist and Refrain Order"

26   barring MNE from operating in the state. (*See* Doc. 1, ¶¶ 101-107). On April 2,

27   2012, the Federal Trade Commission ("FTC") filed suit against MNE and SFS for

28

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT FIRST INTERNATIONAL'S MOTION TO COMPEL ARBITRATION
CASE NO. EDCV 13-01861-VAP (DTB)

1   violating portions of the FTC Act by defrauding consumers. (Doc. 1, ¶¶ 113-117).[5]

2   First Int'l now asks this Court to enforce arbitration provisions contained in payday

3   loan agreements, to which First Int'l is not a party, between Plaintiffs and these

4   same Illegal Payday Lenders. First Int'l's attempt to deny California citizens' access

5   to this Court must be rejected.

## ARGUMENT

### I.   Plaintiffs Did Not Agree to Arbitrate Against First Int'l.

Notwithstanding First Int'l's repeated assertions, Plaintiffs never agreed to arbitrate anything with First Int'l. The loan agreements ("Agreements") at issue are substantially similar and purport to only be between "Borrower" Christina Labajo and "Lender" SFS (Doc. 26-3, p. 32), and "Borrower" John Labajo and "Lender" MNE (Doc. 26-3, p. 49). By way of example, the SFS Agreement states:

> **Parties**: In this agreement ("Loan Agreement") "You" are the person named as Borrower above. "We" or Us are SFS, Inc. dba OneClickCash and its directors, officers, employees, authorized representatives, agents and successors in interest acting within the scope of their authority. (Doc. 26-3, p. 32).

First Int'l is not a "party" as defined in the SFS Agreement. Nevertheless, First Int'l claims it falls within the disputes provision of the arbitration agreement:

> **ARBITRATION PROVISION**: If any dispute arises that We cannot resolve to your satisfaction, You and We hereby agree that we shall arbitrate that dispute in accordance with the terms of this Arbitration Provision . . .As used herein, the words ""dispute" and "disputes" are given the broadest possible meaning and include. . . (g) all claims

---

[5] On May 28, 2014, the District Court of Nevada granted summary judgment to the FTC against MNE and SFS (as well as AMG Services, Inc. ("AMG")) on claims that defendants violated the FTC Act, the Truth in Lending Act ("TILA"), and the Electronic Fund Transfer Act by secretly enrolling borrowers in a ten-pay period renewal plan that actually resulted *in an annual interest rate of 1,560%.* [*See* Exhibits C and D to the Hartley Dec.] **That** is the Originator with whom First Int'l chose to do business and **that** is the transaction that First Int'l demands this Court enforce.

5

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT FIRST INTERNATIONAL'S MOTION TO COMPEL ARBITRATION
CASE NO. EDCV 13-01861-VAP (DTB)

asserted by You individually against Us, and/or any of our agents, consultants, or servicers . . . (hereinafter collectively referred to as "related third parties")[.] (Doc. 26-3, pp. 34, 51).

But this is not a case against SFS or any of its "agents, consultants, or servicers." This is a case against First Int'l for its own independent wrongdoing in permitting unscrupulous payday lenders access to the U.S. electronic payments network. As discussed further below, First Int'l's attempt to fall within the disputes provision by arguing that *Plaintiffs'* allegations make clear First Int'l is an "agent" of the payday lenders is directly contradicted by the allegations in the new Complaint. [6] *See, e.g.,* Doc. 1, ¶ 81 ("Defendants' Origination Agreements . . . either expressly disclaim an agency relationship or make clear by their terms that the nature and scope of the parties' relationship is not that of principal-agent."). Likewise, as discussed further below, First Int'l is not a "servicer" of Plaintiffs' loan as that term is understood and used in the lending industry. While First Int'l (citing to definitions of "service" rather than "servicer") wants this Court to adopt a broad definition of a servicer as someone who provides any service whatsoever, this Court cannot read a party into a contract that the parties did not expressly intend to be there. Indeed, it is a cardinal principle that arbitration "is a matter of consent, not coercion" (*Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)) and the oft-quoted maxim that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit" rings especially true here. *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). First Int'l is not a party by the plain terms of the Agreements.

## II.    The Issue of Arbitrability is for this Court to Decide.

The question whether the parties have submitted a particular dispute to

---

[6] First Int'l's argument that "*Plaintiffs* assert . . . First International . . . served as [the lenders'] agent by processing transaction on their behalf" lacks any evidentiary support. *See* Doc. 26-1, p. 15 (emphasis added).

1   arbitration, *i.e.*, the "*question of arbitrability*," is "an issue for judicial determination

2   [u]nless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean*

3   *Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). As such, California courts "will not

4   assume the parties intended to arbitrate arbitrability absent 'clear and unmistakable

5   evidence that they did so.'" *In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No.

6   1827, 2014 WL 1395733, at * 3 (N.D. Cal. April 10, 2014) (quoting *First Options of*

7   *Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Thus, "[w]here an agreement is

8   silent or ambiguous on the point of who should decide questions of arbitrability, it is

9   the courts' province to decide the arbitrability question." *Id*.

10          First, nowhere do the Agreements provide that an arbitrator should determine

11   the gateway issue of arbitrability. Nevertheless, First Int'l attempts to argue that it

12   should because the "disputes" provisions are defined to include disputes regarding

13   "the validity and scope of this Arbitration Provision, or any claim, dispute, or

14   controversy relating to the interpretation, applicability, enforceability or formation

15   of this Loan Agreement." (Doc. 26-3, p. 34). But this language does not provide

16   "clear and unmistakable" evidence that the parties intended the issue of arbitrability

17   to go to the arbitrator. Even if it did, the provision does not purport to apply to

18   anyone other than parties to the Agreements, which First Int'l is not. At best, it is

19   ambiguous and therefore in "the courts' province to decide the arbitrability

20   question." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2014 WL 1395733, at *3.

21          Second, Plaintiffs do not challenge the validity and scope of the arbitration

22   provision, only whether First Int'l has the right to enforce it. Therefore, Plaintiffs'

23   claims do not fall within the provision even if the language could possibly be

24   construed as "clear and unmistakable" evidence of the parties' intent to arbitrate the

25   issue of arbitrability between Plaintiffs and non-signatory First Int'l.

26          Finally, as recently reaffirmed by the Supreme Court, where a non-signatory

27   is attempting to enforce an arbitration provision, "courts presume that the parties

28

1 intend courts, not arbitrators, to decide . . . questions such as '***whether the parties***
2 ***are bound by a given arbitration clause***[.]'" *BG Group, PLC v. Rep. of Argentina*,
3 134 S.Ct. 1198, 1206-07 (2014) (quoting *Howsam*, 537 U.S. at 84).[7] *See also First*
4 *Options*, 514 U.S. at 941, 943-947 (court should decide whether an arbitration
5 clause applied to a party who "had not personally signed" the document containing
6 it); *Kramer v. Toyota Motor Corp*., 705 F.3d 1122, 1127 (9th Cir. 2013) ("Given the
7 absence of clear and unmistakable evidence that Plaintiffs agreed to arbitrate
8 arbitrability with nonsignatories, the district court had the authority to decide
9 whether the instant dispute is arbitrable."); *Laumann v. Nat'l Hockey League*, No.
10 12 Civ. 1817(SAS), 2013 WL 6171671, at *5 (S.D.N.Y. Nov. 25, 2013) (holding
11 that arbitration of arbitrability "is a question of contract formation and intent, and
12 there is no clear and unmistakable evidence that [plaintiffs] agreed to arbitrate
13 arbitrability with . . . a non-signatory. Thus, it falls to the court to decide whether the
14 . . . arbitration clause applies."). As in these cases, whether First Int'l can invoke the
15 arbitration provision is a threshold issue for the Court to decide, and there is no
16 "clear and unmistakable" evidence that Plaintiffs agreed to arbitrate arbitrability
17 with non-signatories like First Int'l.

18     ### III.    First Int'l Is Not a Third-Party Beneficiary of the Agreements.

19     First Int'l argues that it is a third-party beneficiary of the Agreement's
20 arbitration provisions. However, First Int'l "bears the burden of proving that it is a
21 third-party beneficiary of the . . . agreement[]," *Murphy v. DirecTV, Inc.*, 724 F.3d
22 1218, 1233-34 (9th Cir. 2013), and cannot show that the language in the Agreement
23 expresses the intent of MNE and SFS and Plaintiffs to create contractual rights for
24 First Int'l.

25     In California, "[a] third party qualifies as a beneficiary under a contract if the
26 parties intended to benefit the third party and the terms of the contract make that

27 _____
28 [7] Unless indicated, all emphasis has been added and all internal citations omitted.

1    intent evident." *State Nat'l Ins. Co. v. Khatri*, C 13-00433 LB, 2013 WL 5183193,

2    at \*10 (N.D. Cal. Sept. 13, 2013) (quoting *Karo v. San Diego Symphony Orchestra*

3    *Ass'n*, 762 F.2d 819, 821–22 (9th Cir. 1985)) . Resolving the question of "[w]hether

4    a third party is an intended beneficiary or merely an incidental beneficiary to the

5    contract involves construction of the parties' intent, gleaned from reading the

6    contract as a whole in light of the circumstances under which it was entered." *Jajco,*

7    *Inc. v. Leader Drug Stores, Inc.*, C 12-05703 PJH, 2013 WL 2403593, at \*5 (N.D.

8    Cal. May 31, 2013); *Bultemeyer v. Sys. & Servs. Techs., Inc.*, CV12-0998-PHX-

9    DGC, 2012 WL 4458138, at \* (D. Ariz. Sept. 26, 2012) ("it is not enough that some

10   benefit incidental to the performance of the contract may accrue to the third party.").

11         There is no intent to benefit First Int'l on the face of the Agreements, which

12   identify neither First Int'l nor ODFIs in general. And while First Int'l quotes the

13   unreported case of *Garcia v. Stonehenge, Ltd.*, C-97-4368-VRW, 1998 WL 118177

14   (N.D. Cal. Mar. 2, 1998), to assert it "is not necessary that the contract identify or

15   refer to the alleged third party" in order to show an intention to benefit (Doc. 26-1 p.

16   22), the failure to mention a third party in the agreement is held by the Ninth Circuit

17   to be significant evidence of the contracting parties' *lack of intent* to provide the

18   third party a right to enforce.  *See Murphy*, 724 F.3d at 1234.

19         And even if the Illegal Payday Lenders actually intended to benefit First Int'l,

20   "the third party must demonstrate that the promise he seeks to enforce was actually

21   made to him personally or to a class of which he is a member." *Rankin v. Global*

22   *Tel\*Link Corp.*, 13-CV-01117-JCS, 2013 WL 3456949, at \*12 (N.D. Cal. July 9,

23   2013). The Agreements include no indication that the signatories intended the

24   arbitration provision to apply to First Int'l or even the general class of ODFIs.

25   While First Int'l claims "it makes perfect sense" for the provisions to apply to First

26   Int'l (Doc. 26-1, p. 23), it was not an objectively reasonable expectation of Plaintiffs

27   that the provisions would inure to the benefit of an unknown entity like First Int'l.

28

9

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT FIRST INTERNATIONAL'S MOTION TO COMPEL ARBITRATION
CASE NO. EDCV 13-01861-VAP (DTB)

1    Recognizing this flaw in its argument, First Int'l urges this Court to divine the

2 parties' intent to benefit it by stitching together separate sections of the arbitration

3 provision, awkwardly joining section (c) "all counterclaims. cross-claims and third

4 party claims" with section (g) "all claims asserted by You individually against Us,

5 and/or any of our agents, consultants, or servicers . . ." (Doc 26-3, p. 34) in order to

6 arrive at the result that "here, Plaintiffs' agreements to arbitrate expressly cover

7 "third party claims" asserted against "any of [SFS's or MNE's] agents, consultants,

8 or servicers." [8] (Doc. 26-1 p. 22). Apart from the self-evident fact that Plaintiffs'

9 claims against First Int'l are direct claims and not "third party claims," (*see, e.g.*,

10 Fed. R. Civ. P. 14), First Int'l's assertion that it is "an agent, consultant or servicer"

11 of SFS or MNE does not withstand scrutiny.

12    First Int'l claims to be a "servicer" because it "provided services to SFS and

13 MNE by transmitting the payments Plaintiffs made on their loans" (Doc. 26-1 p.

14 22)—an absurdly overbroad construction of the arbitration agreement which would

15 vacuum up claims against everyone from the telephone service provider to bottled

16 water delivery "services" provided to SFS and MNE.[9] First Int'l's over-expansive

17 definition of "servicer" is at odds with the commonly understood definition of what

18 is a "servicer" of a loan is—"an intermediary between the lender and borrower [that]

19 performs functions such as contacting the borrower on behalf of the lender,

20 maintaining records of payments and balances, collecting and paying taxes and

21 insurance, following up on delinquencies, and structuring or restructuring payment

22

23 _____

24 [8] First Int'l does not suggest it "consulted" with the Illegal Payday Lenders.

25 [9] First Int'l cites *Chastain v. Union Sec. Life Ins. Co.,* 502 F. Supp. 2d 1072, 1077
(C.D. Cal. 2007) for the proposition that it is perfectly acceptable to force claims

26 against even the electricity provider into arbitration in order to avoid thwarting the
federal policy in favor of arbitration, but the citation in question relates to the

27 *Chastain* court's discussion of equitable estoppel, not determining the intentions of

28 the signatories to benefit a third-party with the ability to compel arbitration.

10

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT FIRST INTERNATIONAL'S MOTION TO COMPEL ARBITRATION
CASE NO. EDCV 13-01861-VAP (DTB)

1    plans."[10] (Doc. 1, ¶ 82).

2          Plaintiffs' Complaint lays out numerous legal and financial reporting

3    consequences of ODFIs being defined as "servicers" of the loans for which they

4    originate payments (Doc. 1, ¶¶ 85-86), which First Int'l simply ignores by arguing

5    that the signatories had to be aware of these consequences. In actuality, the

6    consequences show that, *regardless of the signatories' supposed intent*, First Int'l's

7    role as an ODFI cannot make it a servicer without triggering significant federal,

8    state and accounting standards compliance issues which it did not fulfil.[11] First

9    Int'l's own motion demonstrates the legal thicket its "ODFI as servicer" argument

10   lands it when it goes so far as to argue that the definition of a "servicer" under TILA

11   is "specific to mortgage lending," (Doc. 26-1 p. 23) which is demonstrably untrue.

12   The District of Nevada has already determined that TILA applies to the loans made

13   by SFS and MNE (as well as AMG Services, Inc. ("AMG")) when it granted

14   summary judgment to the FTC on its claims that SFS, MNE and AMG violated

15   TILA (*see* Exhibits C and D to the Hartley Decl.). In fact, ***the phrase "Federal***

16   ***Truth-in-Lending" appears no less than 32 times in the Agreements.*** (*See* Doc. 26-

17   3 pp. 27-59). First Int'l's insistence that "Plaintiffs' reliance on "specialized"

18   definitions of a mortgage loan 'servicer' . . . has no basis in the language of

19   Plaintiffs' agreements" (Doc. 26-1, p. 23), is flatly contradicted to its own evidence.

_____

20   [10]First Int'l characterizes Plaintiffs' insistence on the TILA definition of "servicer"

21   as "highly specialized" but, in fact, virtually every consumer loan has a servicer , in

22   stark contrast to the hidden role of ODFIs.

[11] First Int'l cites to the unreported case of *Hornicek v. Cardworks Servicing, LLC*,

23   No. 10–3631, 2011 WL 2623274 (E.D. Pa. June 29, 2011) for the proposition that a

24   court may use the plain meaning of "servicer" over the specific legal definition, but

25   the *Hornicek* court completely failed to examine the compliance ramifications of its

     decision that a collector could be a "servicer" under applicable federal and state law.

26   What is more, in contrast to the Agreements here, the "service" the defendant was

27   providing—collecting on the loan—was specifically enumerated within the

     arbitration provision ("'[a]ny disputes arising from the collection of amounts you

28   owe in connection with your [a]ccount' will be subject to arbitration.").

1         What is more, First Int'l's motion is premised entirely on the declaration of

2    Natalie C. Dempsey who claims to be an employee of AMG. Dempsey asserts that

3    AMG is "a shared service provider" for SFS and MNE, providing among other

4    things, "customer service, collections, accounting, project management and strategic

5    planning." (Doc. 26-3 p. 5). It is telling that AMG is performing all of the services

6    described as traditional loan "servicer" functions in the Complaint while First Int'l

7    has a distinct and separate role.

8        **IV.   First Int'l Is Not An Agent of SFS or MNE.**

9         First Int'l next argues that arbitration is compelled because "Plaintiffs' suit is

10   predicated on the actions that First Int'l allegedly took as an agent 'on behalf of' and

11   'at the request of' SFS and MNE." (Doc. 26-1, p. 24). But these allegations alone

12   come nowhere close to establishing an agency relationship under long-established

13   agency principles. Indeed, whether an agency relationship has been created is to be

14   determined by the relation of the parties as it exists under their agreement or by their

15   acts. *See Nichols v. Arthur Murray, Inc.*, 248 Cal. App. 2d 610, 612 (Cal. App. 4th

16   Dist.1967). "Indicia of an agency relationship are the agent's power to alter legal

17   relations between the principal and others, a fiduciary relationship, and the

18   principal's right to control the agent's conduct." *Vallely Inv., L.P. v. Bancamerica*

19   *Commercial Corp*., 106 Cal. Rptr. 2d 689, 698 (Cal. App. 4 Dist. 2001). "[T]he

20   relationship between the parties is the intent of the parties as disclosed by their

21   agreement and all of the facts and circumstances, including the conduct of the

22   parties." *Cook v. La Vina Land Co*., 39 P.2d 458, 460-61 (Cal. App. 3d Dist. 1934).

23   "In determining whether an agency relationship exists between parties to a business

24   enterprise, which is the subject of an agreement between them, the right to control is

25   an important factor. . . . If, in practical effect, one of the parties has the right to

26   exercise complete control over the operation by the other an agency relationship

27   exists; the former is the principal and the latter the agent." *Nichols*, 248 Cal.App.2d

28

1  at 613.

2         First Int'l only argues the first half of the agency relationship—the "acting on

3  behalf of" component—while ignoring the dispositive element—"control of the

4  agent by the principal." Indeed, First Int'l implies that merely providing some

5  service for the payday lenders makes it an agent under California law ("Plaintiffs'

6  claims against First Int'l are all based on the allegation that First Int'l was

7  performing a service for SFS and MNE to effectuate Plaintiffs' Loan Agreements

8  with those lenders." (Doc. 26-1 p. 25)).

9         First Int'l ignores the control element of agency because the duties First Int'l

10  had under NACHA Rules—to act as an independent monitor for potentially

11  unlawful or inappropriate activity—eliminate any possibility that SFS and MNE

12  "control" the activities of First Int'l. To the contrary, First Int'l was actually

13  entrusted by the NACHA Network with supervising and monitoring SFS and

14  MNE—an arrangement that vitiates any claim of "agency." A similar point is made

15  in *Murphy* in which the Ninth Circuit found no agency relationship existed between

16  an electronics retailer and a satellite TV service provider: "Best Buy has presented

17  no evidence, on appeal or before the district court, that DirecTV controlled its

18  behavior in ways relevant to Plaintiffs' allegations." *Murphy*, 724 F.3d at 1233.

19  Here, First Int'l has not only failed to make a showing of agency, but the NACHA

20  Rules, by which First Int'l was bound, act as an explicit disclaimer that First Int'l

21  could be SFS or MNE's agent.

22         In response, First Int'l argues that "its duties and obligations under the

23  NACHA rules do not negate its alleged agency" (Doc. 26-1, p. 26) because agency

24  relationships can exist in the face of independent duties by the agent. However, First

25  Int'l fails to provide any example of agents whose duties are to police the supposed

26  principal. First Int'l's examples of attorneys and stockbrokers[12] are hardly analogous

27  

28  [12] Attorneys and stockbrokers do not have, as their primary responsibility, a duty to

13

1  to the role of ODFIs in the ACH network under the NACHA Rules where, among

2  other things, "[a]n ODFI is responsible for all Entries originated through the ODFI

3  whether by an Originator or through a Third-Party Sender  . . . [a]n ODFI is

4  responsible for its Originators' and Third-Party Senders' compliance with these

5  Rules." NACHA 2013 Operating Rules, Section 2.1 (Doc. 1, ¶ 47); and where the

6  ODFI is required to have in its Origination Agreements the right to terminate or

7  suspend the agreement for the Originator's breach of the NACHA Rules or other

8  unlawful behavior. (*See* Doc. 1, ¶ 77). As alleged in the Complaint, the NACHA

9  Rules "make clear than an ODFI is not and cannot be considered an 'agent' of the

10 Originator because ODFI banks are required to operate within the confines of the

11 NACHA Rules, not under the direction or control of the Originator." (Doc. 1, ¶ 80).

12 Again, First Int'l's refusal to provide its Origination Agreements with MNE and/or

13 SFS is telling, and it is clear that an Originator simply does not have the right to

14 "exercise complete control"–or any control for that matter—over an ODFI in the

15 context of the ACH Network.

16      Without further analysis, First Int'l cites to *Elder v. BMO Harris Bank*, CIV.

17 JFM-13-3043, 2014 WL 1429334, *2, fn. 4 (D. Md. Apr. 11, 2014) in which the

18 court confused the *evidentiary rule* that co-conspirators are all agents of each other

19 for purposes of attributing statements by one to all, *see, e.g.*, 4 J. Weinstein & M.

20 Berger, Weinstein's Evidence ¶ 801(d)(2)(E)[01], pp. 801-232 and 801-233 (1985)

21 (Weinstein & Berger), with a *legal determination of agency* in order to support the

22 otherwise naked proposition that mere allegations of conspiracy equate with

23 allegations of agency under California law. However, outside of the narrow context

24 of rules of evidence, co-conspirators who are not subject to control by other

25 conspirators are not agents of other conspirators.

26

27 prevent access to the courts or stock exchanges if they suspect their clients are
behaving in contravention of the rules. In short, unlike ODFIs, attorneys and

28 stockbrokers are not "gatekeepers."

14

1    In each of the other cases relied upon by First Int'l, courts found an agency

2    relationship where it traditionally would be found. In *Letizia v. Prudential Bache*

3    *Sec., Inc*., 802 F.2d 1185, 1188 (9th Cir. 1986), the Ninth Circuit merely held that a

4    plaintiff cannot avoid a corporate entity's arbitration agreement by suing an

5    employee of that entity. That decision noted "[s]everal courts have addressed the

6    problem of non[-]signatories in cases factually similar to this one. In virtually every

7    case, they have held the brokerage firm employees bound by the arbitration

8    agreement." *Id*. Similarly, in *Amisil Holdings Ltd. v. Clarium Capital Mgmt*., 622 F.

9    Supp. 2d 825 N.D. Cal. 2007),  a plaintiff sued a hedge fund, its managing member,

10   its CFO and its managing director, and his own complaint "demonstrate[d] that the

11   individual defendants are being sued precisely because of their duties…as officers

12   and managers of [defendant]." *Id*. at 835. Obviously, here Plaintiffs are not suing

13   employees or integral sub-parts of the entities that are SFS and MNE.

14   First Int'l's reliance on *Laster v. T-Mobile USA, Inc*., 05CV1167 DMS WVG,

15   2013 WL 4082682 (S.D. Cal. July 19, 2013), is also unavailing. In that case, the

16   plaintiff "[did] not deny" that a non-signatory was ATTM's agent. Indeed, the

17   plaintiff admitted she understood a non-signatory to be ATTM's "authorized agent

18   for the marketing and sale of [ATTM's] telecommunications products and services."

19   *Id*., at *5. Here, by contrast, the Complaint never once describes First Int'l as an

20   "agent" of SFS and MNE, and in fact alleges the exact opposite. (*See* Doc. 1, ¶¶ 77-

21   81). For similar reasons, First Int'l's reliance on *Reddam v. KPMG LLP*, SACV04-

22   1227GLT(MANX), 2004 WL 3761875 (C.D. Cal. Dec. 14, 2004) is misplaced. In

23   that case too, "Plaintiff allege[d] the non-defendant Deutsche Bank Securities, Inc.,

24   a signatory, and the non-signatory Defendants were agents of each other." *Id*. at *4.

25   First Int'l's cited case of *Mendoza v. Ad Astra Recovery Servs. Inc.*, 2:13-CV-

26   06922-CAS, 2014 WL 47777 (C.D. Cal. Jan. 6, 2014) is completely inapposite

27   because Ad Astra was specifically identified in the arbitration provision as one of

28

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT FIRST INTERNATIONAL'S MOTION TO COMPEL ARBITRATION
CASE NO. EDCV 13-01861-VAP (DTB)

1  the related parties ("[t]he contract further defined 'related parties' to include 'all

2  parent companies, subsidiaries and affiliates of ours (including Ad Astra Recovery

3  Services, Inc.).'" *Id.* at *3. First Int'l cannot rely on the Complaint to establish its

4  purported agency relationship with SFS and MNE when the allegations make clear

5  the opposite is true—SFS and MNE had no right to control the actions of First Int'l.

6  **V.    First Int'l Cannot Invoke Equitable Estoppel.**

7  In *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009), the Supreme Court

8  held that the ability of non-signatories to enforce arbitration provisions is governed

9  by state contract law. *See id.* at 632. The Agreements here are purportedly governed

10  by the laws of the "Santee Sioux Nation of Nebraska" (*see* Doc. 26-3, pp. 29, 33)

11  and the "Miami Tribe of Oklahoma" (*see* Doc. 26-3, pp. 46, 50), respectively. As

12  such, First Int'l cannot proceed under an equitable estoppel theory because it has not

13  met its burden to establish that the law governing the Agreements (here, tribal law)

14  recognizes equitable estoppel as an exception to the general rule that only parties to

15  an arbitration agreement can be compelled to arbitrate.[13] Because First Int'l has not

16  met its burden of showing the law governing the Agreements permit it to invoke

17  equitable estoppel as required under *Arthur Anderson*, the inquiry ends there.

18  But even if this Court considers the issue under California law, First Int'l

19  cannot satisfy either prong of an equitable estoppel inquiry. Under California law,

20  "the doctrine of equitable estoppel applies in two circumstances: (1) when a

21  signatory must rely on the terms of the written agreement in asserting its claims

22  against the non[-]signatory or the claims are "intimately founded in and intertwined

23  with" the underlying contract . . . and (2) when the signatory alleges substantially

24  interdependent and concerted misconduct by the non[-]signatory and another

25  _____

26  [13] First Int'l half-heartedly argues that the governing tribal law does in fact
recognize the equitable estoppel exception. However, the unauthenticated "tribal

27  ordinance" websites First Int'l attempts to link in its brief are inaccessible or do not
exist. (*See* Doc. 26-1, p. 21, fn. 2).

28

16

1    signatory and "the allegations of interdependent misconduct [are] founded in or

2    intimately connected with the obligations of the underlying agreement." *Kramer*,

3    705 F.3d at 1129 (internal quotations omitted). Neither prong is met here.

### A. Plaintiffs' Claims Are Not Intimately Founded In and Intertwined with the Loan Agreements.

6    First Int'l argues that because Plaintiffs' claims rely "on the allegation that

7    Plaintiffs' Loan Agreements were invalid under California usury law," the claims

8    are necessarily "intertwined" with the Agreements containing the arbitration

9    provisions. (Doc. 26-1, p. 27). This argument demonstrates fundamental

10   misapplication of the doctrine, which is to prevent a plaintiff from "on the one hand,

11   seek[ing] to hold the non-signatory liable pursuant to duties imposed by the

12   agreement, which contains an arbitration provision, but, on the other hand,

13   deny[ing] arbitration's applicability because the defendant is a non-signatory."

14   *Murphy*, 724 F.3d at 1229. As such, the doctrine is only satisfied where the plaintiffs

15   seek to "invoke the [non-signatory's] duties and obligations" under the underlying

16   agreements to assert their claims, while at the same time rejecting the agreement to

17   avoid arbitration. *See id.* at 1231. *See also Am. Bankers Ins. Grp., Inc. v. Long*, 453

18   F.3d 623, 628 (4th Cir. 2006) (noting that estoppel is only appropriate if the

19   signatory's underlying claims are "in substance" based on the non-signatory's

20   "alleged breach of the obligations and duties assigned to it in the agreement").

21   Here, First Int'l does not argue that it breached any obligations or duties

22   assigned to it in the Agreements because First Int'l *had no duties or obligations*

23   under the Agreements. Two recent Ninth Circuit decisions illustrate that where the

24   plaintiffs' claims are not premised on the non-signatory's violations of its duties or

25   obligations under the agreement containing the arbitration clause, simply having

26   some "relation" to the subject matter of the underlying agreement is insufficient to

27   invoke estoppel. In *Kramer*, purchasers of certain vehicles brought a putative class

28   action against Toyota and its affiliated dealers alleging the vehicles had defective

17

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT FIRST INTERNATIONAL'S MOTION TO COMPEL ARBITRATION
CASE NO. EDCV 13-01861-VAP (DTB)

braking systems. *See* 705 F.3d at 1124. Although the purchasers' "Purchase Agreements" with their dealerships contained broad arbitration provisions, Toyota was not a signatory to any of the agreements. *See id*. at 1124-25. The Ninth Circuit expressly rejected Toyota's argument that the plaintiffs' claims were necessarily intertwined with the Purchase Agreements merely because the lawsuit was predicated on the purchase. The court held that the plaintiffs' claims, which largely arose under California's consumer protection law, did not depend on violations of the terms of the agreements. *Id*. at 1130-32. Likewise, the fact that the plaintiffs relied on the "price term" of the Purchase Agreements was insufficient to "intertwine" the claims because "[u]nder California law, mere reference to a term of the Purchase Agreements is not enough" to invoke estoppel. *Id*. at 1132.

In *Murphy*, the Ninth Circuit reversed the holding that estoppel compelled customers to arbitrate claims against non-signatory Best Buy based on their arbitration agreement with DirecTV. The court held that "[e]ven if Best Buy is correct that [p]laintiffs' claims on some abstract level require the existence of the Customer Agreement, the law is clear that this is not enough for equitable estoppel." 724 F.3d at 1230. In both cases, the courts found that compelling arbitration would not further the purpose of the doctrine. *Kramer*, 705 F.3d at 1134 ( "[p]laintiffs do not seek to simultaneously invoke the duties and obligations of Toyota under the Purchase Agreement, ***as it has none***, while seeking to avoid arbitration."); *Murphy*, 724 F.3d at 1231 (citing *Kramer* for same proposition).

A recent case in this Court further explicates *Kramer* and *Murphy* and confirms that "intertwine" and "rely" require more than simply referring to terms in the agreement containing the arbitration provision:

> To the extent Defendants contend the "rely" or "intertwined" test can be met where an agreement is simply referred in the complaint or the existence of the agreement is presumed, the Court does not agree. While some cases use language of "refer to" or "presume the

18

existence of," that language must be taken in context. Defendants have not pointed to any case where the mere reference to an agreement (containing an arbitration clause) is adequate to demonstrate reliance. *See, e.g., Amisil Holdings Ltd. v. Clarium Cap. Mgmt., LLC*, 622 F.Supp.2d 825, 841 (N.D. Cal. 2007) (a pre-*Carlisle* case, stating that "each of the claims are related to the Agreement in a way that either refers to or presumes the existence of the Agreement" because "[a]bsent the Operating Agreement, ***none of these claims would lie***"; adding that "*Amisil* cannot use the Agreement as a sword and at the same time choose to ignore it as a shield").

*In re Carrier IQ, Inc. Consum. Priv. Litig.*, C-12-MD-2330 EMC, 2014 WL 1338474, at *8 (N.D. Cal. Mar. 28, 2014). First Int'l fails to analyze these instructive cases in any depth,[14] and instead relies on *Elder*'s cursory equitable estoppel analysis *under Maryland law*, which never considers *Kramer* or *Murphy* and, again, requires only a *reference* to the terms of the written agreement in order for estoppel to apply ("[c]learly, plaintiff must rely on the terms of the written agreement in which the arbitration clause is contained because it is that agreement that contains the allegedly usurious interest provision upon which this law suit is based." *Elder*, 2014 WL 1429334, at *1). *Elder* is directly contrary to Judge Chen's

---

[14] First Int'l cites *Kramer* and notes that there "Plaintiffs [did] not seek to enforce or challenge the terms, duties, or obligations of the Purchase Agreement" *Kramer*, 705 F.3d at 1133 (Doc. 26-1, p. 28).  But this supports Plaintiffs' position. As in *Kramer,* Plaintiffs do not seek to enforce or challenge the terms, duties, or obligations of the Agreements because, like Toyota, First Int'l has no duties or obligations under the Agreements. Likewise, First Int'l cites *Murphy* for the point that the Complaint is "replete with allegations of deceit by [non-signatory defendant] that have nothing to do with the Customer Agreement." *Murphy*, 724 F.3d at 1230. The same is true here. Plaintiffs' claims are based on First Int'l's actions in assisting unlicensed payday lenders in violation of the NACHA Rules and other duties, giving rise to claims under federal RICO and California state laws prohibiting such conduct—not the terms of the Agreements. Plaintiffs' allegations do not rely on or even reference the terms of the Agreements except to state the obvious point that the interest rates are usurious. *Kramer* made clear that a "mere reference to a term of the [underlying agreement] is not enough." 705 F.3d at 1132.

1    decision in *In re Carrier IQ*.

2        First Int'l's reliance on *In re Apple iPhone 3G Prods. Liab. Litig*., 859 F.

3   Supp. 2d 1084 (N.D. Cal. 2012), a case that precedes the Ninth Circuit's decisions

4   in *Kramer* and *Murphy*, is also misplaced. In that case, the plaintiffs brought claims

5   against the cell phone service provider (ATTM) that had an arbitration clause in its

6   agreement and also sued Apple as the non-signatory manufacturer of the phone. *See*

7   *id*. at 1093. The court permitted Apple to enforce the arbitration clause under the

8   equitable estoppel doctrine, emphasizing that the plaintiffs had conceded

9   "throughout this litigation that their claims against Defendant Apple and Defendant

10   ATTM arise from their service agreements with ATTM." *Id*. at 1096. Based on

11   these admitted facts, the court stated that "it necessarily follows that [p]laintiffs'

12   allegations [against Apple] are 'intertwined' with their contracts with Defendant

13   ATTM . . . ." *Id*.

14        Plaintiffs have made no such concessions here, nor do their claims "arise

15   from" or rely on First Int'l duties and obligations under the Agreement (which it has

16   none) like the *Apple iPhone* plaintiffs' claims arose from ATTM's alleged failure to

17   provide speedy cell service. Indeed, Plaintiffs do not allege SFS, MNE or First Int'l

18   breached the Agreements. *See, e.g., Goldman v. KPMG LLP*, 173 Cal.App.4th 209,

19   230, 92 Cal.Rptr.3d 534, 551-52 (2009) (holding that in California, equitable

20   estoppel is inapplicable where a plaintiff's "allegations reveal no claim of any

21   violation of any duty, obligation, term or condition imposed by the [underlying]

22   agreements"). Here, Plaintiffs are seeking to hold First Int'l liable for its actions as

23   an ODFI in facilitating illegal payday loan transactions across the ACH Network.

24   Compelling arbitration would not further the purpose of the doctrine because

25   Plaintiffs do not seek to invoke the *duties and obligations of First Int'l* under the

26   Agreements while simultaneously seeking to avoid arbitration.

27        Finally, First Int'l contends that "[c]ourts have repeatedly required arbitration

28

of disputes with non-signatories where, as here, the central claim is that the agreement containing the arbitration provision is void or otherwise illegal." (Doc. 26-1, p. 29). If "courts have repeatedly" done so, First Int'l has cited no examples. The cases First Int'l cites do not in any way support its argument. For example, *Laguna v. Coverall N. Am., Inc.*, No. 09cv2131, 2011 WL 3176469, (S.D. Cal. July 26, 2011), stands for the proposition that a plaintiff must be able to assert his claims *regardless of the presence of the underlying agreement* in order to avoid being compelled to arbitrate (*i.e.*, plaintiffs can assert their claims "even if the contract containing the arbitration clause was void")—not that parties must arbitrate with non-signatories where they claim the underlying agreement is void or illegal. *See also Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293, 299 (S.D.N.Y. 2005) (where signatory can "allege the same causes of action against [the non-signatory] were the [underlying agreements] void," signatory's claims cannot be intertwined with underlying agreement).[15]

Here, Plaintiffs' federal and state-law statutory claims can be asserted whether or not the Agreements are void.[16] *See, e.g., Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844 (9th Cir. 2013) (rejecting argument to compel estoppel where "[plaintiff] does not contend that [non-signatory] or any other party breached the terms of the contract. Instead, [plaintiff] has "statutory claims that are separate from the . . . contract itself.'"); *Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 392, 396 (4th Cir. 2005) (rejecting estoppel where signatory's "claim is a statutory remedy

---

[15] First Intl's pre-*Kramer* and *Murphy* authority *Cardenas v. AmeriCredit Fin. Servs. Inc.*, C 09-04978 SBA, 2011 WL 2884980 (N.D. Cal. July 19, 2011) ("equitable estoppel precludes Mrs. Cardenas from avoiding the arbitration clause contained in the Agreement while simultaneously predicating her UCL claim on alleged infirmities of that document") is contrary to *Kramer*, *Murphy* and Judge Chen's holding in *In re Carrier IQ* that the "mere reference to an agreement" (containing an arbitration clause) is adequate to demonstrate reliance.

[16] For example, Plaintiffs' RICO claims require only that the loans be "unenforceable" under State or Federal law, not "void." 18 U.S.C. § 1961(6).

1    under the Fair Credit Reporting Act and is wholly separate from any action or

2    remedy for breach of the underlying mortgage contract that is governed by the

3    arbitration agreement."). As in these cases, Plaintiffs' claims are largely statute-

4    based and do not relate to an action or remedy for breach of the underlying

5    Agreements. Accordingly, Plaintiffs' claims are not intertwined with the

6    Agreements under California law.

7    **A.    First Int'l Cannot Satisfy the Substantially Interdependent and
             Concerted-Misconduct Test for Invoking Equitable Estoppel.**

8

9         With respect to the second prong of the equitable estoppel test, First Int'l

10   argues that "Plaintiffs' own allegations of concerted misconduct" compel them to

11   arbitrate. (Doc. 26-1, p. 30).[17] But under established California law, concerted

12   misconduct is insufficient to invoke estoppel absent allegations of collusion that are

13   "inextricably bound up" with the obligations imposed by the underlying agreement.

14        It is well-established that "California state contract law does not allow a

15   nonsignatory to enforce an arbitration agreement based upon a mere allegation of

16   collusion or interdependent misconduct between a signatory and non-signatory."

17   *Kramer*, 705 F.3d at 1132-33. *See also Murphy*, 724 F.3d at 1232 ("Mere allegations

18   of collusion are insufficient to trigger equitable estoppel."); *Goldman*, 173 Cal. App.

19   4th at 234 ("every conspiracy claim alleges interdependent and concerted

20   misconduct . . . . [b]ut no principle of law—and certainly not the doctrine of

21   equitable estoppel—allows us to decide that a plaintiff who did not agree to arbitrate

22   with a defendant must do so simply because he alleges a conspiracy"). As such, to

23   _____

24   [17] In its argument on this point, First Int'l appears to blend competing standards. It
     argues in some places in favor of the "close relationship" standard adopted in some

25   jurisdictions and in other places for the "substantially interdependent and concerted-

26   misconduct" test adopted in California. (*See* Doc. 26-1, pp. 27-29). As noted by the
     Ninth Circuit however, "*Kramer* adopted as a controlling statement of California

27   law" the substantially interdependent and concerted-misconduct standard. *See*

28   *Murphy*, 724 F.3d at 1232.

invoke estoppel under this second prong, the allegations "must also establish that the plaintiff's claims against the nonsignatory are intimately founded in and intertwined with the ***obligations imposed by the contract*** containing the arbitration clause." *Murphy*, 724 F.3d at 1231 (quoting *Goldman*, 173 Cal. App. 4th at 223). As discussed above, Plaintiffs' claims are not intertwined with the Agreements and therefore cannot be intimately founded in those Agreements.

In *Goldman*, investors brought claims against their accountants, attorneys, and investment advisors for, among other things, breach of fiduciary duty and fraud related to a fraudulent tax avoidance scheme. 173 Cal. App. 4th at 213. The accountants and attorneys, who were not parties to the limited liability company operating agreements used to further the scheme, sought to compel arbitration, relying on the doctrine of equitable estoppel. *Id*. at 216. The court held that the claims were "unrelated to any of the obligations in the operating agreements, which were merely a procedural and collateral step in the creation of the fraudulent tax shelters" and expressly rejected the non-signatories' argument that "the 'concerted misconduct' alleged in the complaints is 'integrally tied up with' the operating agreements, because but for their execution of the operating agreements, [defendants] could not have invested in the funds and generated their tax losses." *Id*. at 218, 233. The same rationale applies here. Even though Plaintiffs' claims would not exist without the illegal loans, allegations of conspiratorial conduct are not enough where Plaintiffs do not "rely on or use any terms or obligations of the . . . agreements as a foundation for their claims." *Id*. at 218.  Cases from other Circuits agree that concerted misconduct alone is not enough to invoke equitable estoppel. For example, the Eleventh Circuit has specifically rejected the argument that the mere allegation of a RICO conspiracy between a non-signatory defendant and a signatory non-defendant requires a finding of equitable estoppel:

> A plaintiff's allegations of collusive behavior between the signatory
> and nonsignatory parties to the contract do not automatically compel a

court to order arbitration of all of the plaintiff's claims against the nonsignatory defendant; rather, such allegations support an application of estoppel only when they "establish[ ] that [the] claims against [the non-signatory are] intimately founded in and intertwined with the obligations imposed by the [contract containing the arbitration clause]."

*In re Humana Inc. Managed Care Litig.*, 285 F.3d 971, 975 (11th Cir. 2000). *See also In re Wholesale Grocery Prods. Antitrust Litig.*, 707 F.3d 917, 923 (8th Cir. 2013) (equitable estoppel applies only where plaintiff's claims "arose directly from violations of the terms of a contract containing an arbitration clause.").

The cases cited by First Int'l on this point are easily distinguishable. In *Boston Telecomm. Group, Inc., v. Deliotte Touche Tohmatsu*, 278 F. Supp. 2d 1041, 1048 (N.D. Cal. 2003), the court permitted estoppel where "Plaintiffs themselves allege[d] that [the non-signatory] was acting . . . in his capacity as an agent of . . . a signatory to the Partnership Agreement[.]" As set forth above, Plaintiffs here do not allege an agency relationship between the Illegal Payday Lenders and non-signatory First Int'l. First Int'l's reliance on *Hansen v. KPMG, LLP*, No. CV 04-10525, 2005 WL 6051705, at *3 (C.D. Cal. Mar. 29, 2005) is also misplaced because there, the court never analyzed whether the claims were intimately founded in and intertwined with the *obligations imposed* by the contract. *Kramer* adopted as a controlling statement of California law the equitable estoppel rule set forth in *Goldman*, which in turn provided that equitable estoppel only applies due to the "interdependent and concerted misconduct" prong when that misconduct is "founded in or intimately connected with the obligations of the underlying agreement." *Murphy*, 724 F.3d at 1232. The lack of this analysis in *Hansen* renders it meaningless.[18]  Accordingly, First Int'l cannot estop Plaintiffs from litigating their claims before this Court.

_____

[18] First Int'l also cites to *In re Apple & AT&T Mobility Antitrust Litig.*, 826 F. Supp. 2d 1168 (N.D. Cal. 2011), but that case has little relevance here because the court applied the "close relationship" standard adopted by the Second Circuit and gave no discussion as to whether there was substantially interdependent and concerted conduct. *See id.* at 1177-79. This case is unpersuasive post-*Kramer* and *Murphy*.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.    First Int'l's Unclean Hands Bars it from Utilizing Equitable Doctrines to Enforce Clauses Contained in the Loan Agreements.**

Finally, even if First Int'l could satisfy both prongs of the equitable estoppel test discussed above, it is a fundamental principle of law that, "he who comes into equity must come with clean hands." *Intamin, Ltd. v. Magnetar Tech. Corp*., 623 F. Supp. 2d 1055, 1074 (C.D. Cal. 2009) *aff'd*, 404 F. App'x 496 (Fed. Cir. 2010) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co*., 324 U.S. 806, 814 (1945)). Here, the inequitable conduct is clear from the face of the Agreements. First Int'l collected on debts that were illegal under the law of California and twelve other states and then sought to rely on those very same illegal contracts in order to compel arbitration.  At the very least, First Int'l's unconscionable actions here in both collecting on illegal debts and then attempting to enforce rights springing from illegal contract have "immediate and necessary relation to the equity that [First Int'l] seeks in respect of the matter in litigation." *Keystone Driller Co. v. General Excavator Co*., 290 U.S. 240, 245 (1933).

"California courts will not 'fashion an equitable remedy'" where doing so involves "enforcing the precise conduct made unlawful ... in contravention of the legislative purpose . . ." *Joe A. Freitas & Sons v. Food Packers, Processors & Warehousemen Local 865*, 211 Cal. Rptr. 157, 162 (Cal. Ct. App. 1985) (citing *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 84 (1982)). The doors of equity are therefore closed to First Int'l's use of doctrines such as equitable estoppel to enforce clauses contained in the agreements for an illegal loan. *See Hawkins v. KPMG LLP*, 423 F. Supp. 2d 1038, 1052 (N.D. Cal. 2006) (doctrine of unclean hands precludes court from applying equitable estoppel to compel arbitration of claims against non-signatory based on fraudulent agreement). In sum, First Int'l has not met its high burden in establishing the threshold issue that it can enforce the Agreements under the principles of equitable estoppel, and the purpose of the doctrine and principles of equity would not be furthered by compelling arbitration in this case.

1

Dated:  June 10, 2014

2

Respectfully submitted,

3

4

By:     s/Jason Hartley_____

Jason Hartley

5

**STUEVE SIEGEL HANSON LLP**

550 West C. Street, Suite 1750

6

San Diego, CA 92101

Tel:    (619) 400-5822

7

Fax:    (619) 400-5832

8

Steve Six

9

(admitted *pro hac vice*)

**STUEVE SIEGEL HANSON LLP**

10

460 Nichols Road, Suite 200

Kansas City MO 64112

11

Tel:    (816) 714-7100

Fax:    (816) 714-7101

12

13

Darren T. Kaplan

(*pro hac vice forthcoming*)

14

**CHITWOOD HARLEY HARNES LLP**

1350 Broadway, Suite 908

15

New York, NY 10018

Tel:    (917) 595-4600

16

Fax:    (404) 876-4476

dkaplan@chitwoodlaw.com

17

18

Jeffrey M. Ostrow

19

(*pro hac vice forthcoming*)

Jason H. Alperstein

20

(*pro hac vice forthcoming*)

**KOPELOWITZ OSTROW P.A.**

21

200 S.W. 1st Avenue, 12th Floor

Fort Lauderdale, Florida 33301

22

Tel:    (954) 525-4100

Fax:    (954) 525-4300

23

ostrow@KOlawyers.com

alperstein@KOlawyers.com

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Hassan A. Zavareei (CA Bar No. 181547)
Jeffrey D. Kaliel (CA Bar No. 238293)
Anna C. Haac
(*pro hac vice forthcoming*)
**TYCKO & ZAVAREEI LLP**
2000 L Street, N.W., Suite 808
Washington, D.C. 20036
Tel:    (202) 973-0900
Fax:    (202) 973-0950
hzavareei@tzlegal.com
jkaliel@tzlegal.com
ahaac@tzlegal.com

*Counsel for Plaintiffs and the Class*

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT FIRST INTERNATIONAL'S MOTION TO COMPEL ARBITRATION
CASE NO. EDCV 13-01861-VAP (DTB)